***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Glenn and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All the parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over the parties and this claim. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between Paul F. Fuller, Jr. (hereinafter "decedent") and defendant-employer on May 16, 2002.
3. Lumbermen's c/o Gallagher Bassett Services is the carrier on the risk.
4. Decedent's average weekly wage was $2,096.16 per week, yielding the maximum compensation rate for 2002 of $654.00 per week.
5. Decedent had three dependent minor children: Annie Camp Fuller, born May 23, 1002; Paul Slade Fuller, born October 29, 1993; and Landon Alyce Fuller, born May 13, 1996.
6. On May 16, 2002, decedent was fatally injured while traveling from Greensboro, N.C. to Myrtle Beach, S.C.
7. The Pre-Trial Agreement along with its attachments and any stipulations submitted by the parties are hereby incorporated by reference as though they were fully set out herein.
8. The issues before the Full Commission are whether decedent was injured by accident while in the course and scope of his employment with defendant-employer, who were decedent's dependents at the time of his death and what benefits, if any, decedent's dependents are entitled to receive under the North Carolina Workers' Compensation Act.
 ***********
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. Decedent was employed by defendant-employer as Program Director for radio station WTQR and as the co-host of the station's morning drive time radio program, which aired from 5:30 a.m. to 10:00 a.m.
2. As Program Director, decedent was responsible for determining the "sound" of the radio station, including the music, syndicated programs, "on the air" personalities, and content of the broadcast. As the morning show co-host, decedent worked with broadcast partner Toby Young, who appeared on the air as a female character, "Aunt Eloise." Decedent wrote material, determined the content of the show, interviewed guests, promoted the products of advertisers and made the show appealing to a large number of listeners. Decedent was the sole "face" and representative of the morning show in public appearances because the identity of "Aunt Eloise" was kept a secret to most listeners. Decedent and other radio personalities, such as Angie Ward Satterfield, regularly traveled away from the radio station to make public appearances and live broadcasts.
3. The radio industry's ratings period occurs several times a year. During the ratings period, also known as "the book," radio listeners are surveyed and asked to complete diaries that are used to determine the size and demographics of a program's audience. Audience demographics determine advertising rates for the station's different programs. The morning radio show often has the largest number of listeners and is important in determining the advertising rates at WTQR.
4. As Program Director and co-host of the morning show, decedent never took a vacation during a ratings period and did not allow the other radio personalities under his supervision to take a vacation during a rating period. Decedent and his family did not take vacation time until after the spring ratings period was completed and decedent appeared as a radio personality in the Fourth of July events sponsored by WTQR.
5. Crossroads Harley-Davidson is a Harley-Davidson dealership located in Wilkes County, North Carolina, and is a longtime regular advertiser on WTQR. Mark Cox, owner of Crossroads Harley-Davidson, began his professional relationship with decedent when decedent was working with a Charlotte, North Carolina, radio station. Beginning in 1996, Crossroads Harley-Davidson started to aggressively advertise on WTQR and made yearlong advertising commitments to WTQR at the beginning of each year. During 2002, Crossroads Harley-Davidson purchased pre-recorded thirty-second advertising spots that were broadcast during the afternoon. Additionally, Crossroads Harley-Davidson purchased one-minute live advertisements that were broadcast every Friday morning on the program hosted by decedent and "Aunt Eloise." The advertisements consisted of dialogue between "Aunt Eloise" and decedent, known on air as "Big Paul." Mr. Cox worked with WTQR sales representative Patty Lynch and often provided copy points for the one-minute live advertisement broadcast on the morning show. The copy points emphasized sales or events sponsored by Crossroads Harley-Davidson that Mr. Cox wanted to promote.
6. In spring 2002, Crossroads Harley-Davidson promoted two events on the radio station, a big beach bash open house at Crossroads Harley-Davidson during the first week in May, and Myrtle Beach Bike Week. The open house at Crossroads Harley-Davidson, held two weeks before the Myrtle Beach Bike Week, provided free tickets to the Myrtle Beach Bike Week rally that was sponsored by Crossroads Harley-Davidson. The advertisements on the radio station also encouraged listeners to spend money at Crossroads Harley-Davidson by having their bikes serviced and purchasing equipment and clothes for Myrtle Beach Bike Week.
7. In addition to the pre-recorded afternoon advertisements and the Friday morning live dialogue advertisements, Mr. Cox periodically called in to the morning radio show or came by the radio station to appear as a live guest. During his call-in or live guest appearances, Mr. Cox talked about being a professional motorcycle racer and also talked about events sponsored by the motorcycle dealers association to which he belonged. In spring 2002, Mr. Cox spoke on the air about Myrtle Beach Bike Week, which was sponsored by his motorcycle dealers association.
8. In the weeks prior to May 17, 2002, decedent and Toby Young as "Aunt Eloise" spoke on air about the upcoming Myrtle Beach Bike Week in order to increase listeners by appealing to people interested in motorcycles. Their conversations included having Mr. Cox as a guest on the show and talking about decedent riding his Harley-Davidson, which he purchased at Crossroads Harley-Davidson and which displayed a Crossroads Harley-Davidson decal on the windshield, to Myrtle Beach for Bike Week. "Aunt Eloise" teased decedent about how she did not have a Harley-Davidson and she was not going to be able to go to Bike Week. Multiple times in the weeks prior to May 17, 2002, as a continuing part of their attempt to increase audience share and appeal to motorcycle enthusiasts, "Aunt Eloise" and decedent promised the listeners of the morning show that decedent would call in to the show live from Myrtle Beach Bike Week on Friday morning, May 17, 2002.
9. Decedent and his wife, Susan Bardin Fuller, planned to celebrate their wedding anniversary by going to Myrtle Beach for Bike Week. Decedent and his wife had attended previous Bike Week events and had always left for the events after decedent's show on Friday. Likewise, they planned to leave for Myrtle Beach after decedent got off the air at 10:00 a.m. on Friday, May 17, 2002. However, their travel plans changed because the only way for decedent to talk about Bike Week on the air was for him to go the day before so he could appear live during the radio broadcast on Friday morning, May 17, 2002. Decedent and Mrs. Fuller decided to leave on Thursday after decedent completed work rather than Friday after the morning show for the sole purpose of allowing decedent to call in to the Friday morning show live from Myrtle Beach Bike Week.
10. Prior to leaving for Myrtle Beach, Mrs. Fuller spoke with her husband regarding the planned call to the radio station for the morning of May 17, 2002, and they rehearsed what they would say on air. Mrs. Fuller had previously appeared on the radio show and bantered with "Aunt Eloise" and she planned to participate in the call to the radio show on the morning of May 17, 2002. Mrs. Fuller's role during the call was to banter or "joke around" with "Aunt Eloise," tell "Aunt Eloise" what she was missing in Myrtle Beach and provide "Aunt Eloise" an opportunity to "get on her soapbox." After the Friday morning call was made, Mrs. Fuller and decedent planned to remain in Myrtle Beach, enjoy Bike Week with their friends and celebrate their wedding anniversary.
11. Decedent and Mrs. Fuller's live telephone call to "Aunt Eloise" was to take place sometime between 8:15 a.m. and 8:45 a.m. on Friday, May 17, 2002. The call was to last approximately three to five minutes and coincided with the time decedent and "Aunt Eloise" were scheduled to air a one-minute live advertisement for Crossroads Harley-Davidson. The live advertisement was scheduled to air at 8:22 a.m. WTQR policy is that advertisements will be broadcast within 15 minutes of the scheduled time.
12. The Friday morning call decedent was scheduled to make from Myrtle Beach Bike Week on May 17, 2002 was not a live remote broadcast that normally lasts for several hours and entails the use of technical support personnel and a broadcast truck. The telephone call was similar to other planned phone calls, such as when Rich Brenner, a local TV sports broadcaster, called WTQR at a planned time, using a cell phone to report on a motorcycle ride in which he was participating. Drivers who won a NASCAR race were scheduled to and regularly placed telephone calls to WTQR without the use of special broadcasting equipment.
13. At his deposition, Morgan Bohannon, General Manager of WTQR, testified that he was a regular listener of the morning show and that he had reviewed the advertising records of Crossroads Harley-Davidson. He then testified that Crossroads Harley-Davidson had not advertised on WTQR since December 2001. Immediately prior to the lunch break, plaintiff's counsel informed Mr. Bohannon that counsel possessed the advertising invoices from WTQR and Crossroads Harley-Davidson for 2002 and 2003. After the lunch break, Mr. Bohannon testified that he made a mistake in his earlier testimony and confused Crossroads Harley-Davidson with another Harley-Davidson dealership. Mr. Bohannon then testified under oath that, during the lunch break, he reviewed the advertising records of Crossroads Harley-Davidson and wished to correct his previous erroneous testimony. During cross-examination, it was revealed that, contrary to his testimony under oath, Mr. Bohannon had not reviewed advertising records during the break. Mr. Bohannon then testified that he made a telephone call to a subordinate at the radio station and relayed what that unidentified employee told him. As a result, the Full Commission gives little weight to Mr. Bohannon's testimony. Defendants chose not to produce the advertising invoices for Crossroads Harley-Davidson, but instead chose to rely on the testimony of Mr. Bohannon regarding the substance of the records.
14. It is the policy of WTQR that employees requesting a vacation day must fill out a vacation request form. Although Mr. Bohannon testified that decedent requested a vacation day for May 17, 2002, defendants did not produce any documentary evidence of such a request, as required by defendant-employer's own policy. Therefore, the Commission finds that decedent did not fill out a vacation request form for Friday, May 17, 2002.
15. The purpose of decedent's call from Bike Week to the morning show was to retain motorcycle enthusiasts as listeners, increase WTQR's audience by making the show lively and interesting, and encourage interest in motorcycle riding, which directly benefited WTQR advertiser Crossroads Harley-Davidson. Decedent traveled to Myrtle Beach on Thursday, May 16, 2002, rather than Friday, May 17, 2002, for the purpose of increasing WTQR's listening audience during a ratings period. The increased listening audience during a ratings period would have led to an increase in advertising revenue and an enhanced relationship between WTQR and Crossroads Harley-Davidson, particularly since the promotion of Myrtle Beach Bike Week was scheduled to coincide with a live advertisement for Crossroads Harley-Davidson. The live call-in broadcast from Myrtle Beach was a substantial benefit to WTQR, as planned and promoted by decedent and Toby Young.
16. The planned live call-in from Myrtle Beach Bike Week necessitated decedent's travel to Myrtle Beach for the benefit of his employer on Thursday, May 16, 2002. Decedent could not travel to Myrtle Beach on Friday, May 17, 2002 to arrive in time to participate in the morning show that same day. In addition, decedent could not have called in to the morning show on Saturday, May 18, 2002, because the Saturday morning show was not live but was a taped replay of the "best of" the previous weeks' shows. If the trip to Myrtle Beach had been solely for personal reasons, decedent would have left for Myrtle Beach after completing his morning radio show on Friday, May 17, 2002.
17. The Commission gives greater weight to the testimony of Mrs. Fuller, Mr. Young, and Mr. Cox concerning the purpose of decedent's trip to Myrtle Beach than to the testimony of Mr. Bohannon, Shannon Sopina and Ms. Satterwhite.
18. On May 16, 2002, decedent and Mrs. Fuller traveled toward Myrtle Beach for the purpose of allowing decedent to call in to the morning show on May 17, 2002. On the way to Myrtle Beach decedent was fatally injured in a motor vehicle accident.
19. Susan Bardin Fuller was married to and lived with decedent at the time of his death and was dependent upon decedent for her support. Decedent had three dependent minor children at the time of his death: Annie Camp Fuller, born May 23, 1002; Paul Slade Fuller, born October 29, 1993; and Landon Alyce Fuller, born May 13, 1996. Other than the four named dependents, there were no other persons wholly dependent for support upon the earnings of decedent.
20. Plaintiffs incurred medical expenses in the amount of $368.50 to Randolph County Emergency Medical Services and $727.20 to Randolph Hospital, for the treatment of dededent's injuries sustained as a result of the fatal injury by accident.
21. Plaintiffs incurred funeral expenses in the amount of $2,534.39 to Hayworth-Miller-Cain Funeral Home.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. The general rule in this state is that an injury sustained by an employee while going to or returning from his place of employment does not arise out of and in the course of his employment. Barham v. FoodWorld, 300 N.C. 329, 266 S.E.2d 676 (1980). However, such injury may be compensable if at the time of the injury the employee is engaged in doing the business of and acting for the benefit of the employer. Humphrey v.Laundry, 251 N.C. 47, 110 S.E.2d 467 (1959).
2. Employees whose work requires travel away from the employer's premises are within the course of their employment continuously during the travel, unless there is a departure or deviation for personal reasons.Cauble v. Soft-Play, Inc., 124 N.C. App. 526, 477 S.E.2d 678 (1996),disc. review denied, 345 N.C. 751, 485 S.E.2d 49 (1997); Chandler v. TeerCo., 53 N.C. App. 766, 281 S.E.2d 718 (1981), aff'd per curiam,305 N.C. 292, 287 S.E.2d 890 (1982); Martin v. Georgia-Pacific Corp.,5 N.C. App. 37, 167 S.E.2d 790 (1969).
3. In the case at bar, decedent's work entailed travel away from the employer's premises. Decedent was within the course of his employment continuously during the Thursday, May 16, 2002, trip to Myrtle Beach and did not make a distinct departure for a personal errand. Decedent was within the course of his employment while making a journey to perform a service on behalf of defendant-employer. Clark v. Burton Lines,272 N.C. 433, 438, 158 S.E.2d 569, 572 (1968).
4. Our courts have recognized the dual purpose rule, and in Murray v.Associated Insurers, Inc., 341 N.C. 712, 462 S.E.2d 490 (1995), the North Carolina Supreme Court set out the test for determining whether a trip that has both personal and business purposes is compensable under the Workers' Compensation Act:
 If the work of the employee creates the necessity for travel, [he] is in the course of his employment, though he is serving at the same time some purpose of his own. . . . If however, the work has had no part in creating the necessity for travel, if the journey would have gone forward though the business errand had been dropped, and would have been canceled upon failure of the private purpose, though the business errand was undone, the travel was then personal, and personal the risk.
Id. at 714, 462 S.E.2d at 491 (quoting Humphrey v. Laundry, 251 N.C. 47, 51,110 S.E.2d 467, 470 (1959)).
5. Decedent's trip to Myrtle Beach was for a dual purpose. First, the trip was to benefit defendant-employer by increasing the listening audience to WTQR's morning radio show and to enhance the strong relationship between WTQR and one of its regular advertisers, Crossroads Harley-Davidson. The second purpose of the trip was for decedent to personally enjoy Bike Week with his friends and celebrate his anniversary with his wife. If the business purpose of the trip had been dropped, the trip would not have been made on Thursday, May 16, 2002. Instead, the personal travel would have been conducted after work on Friday, May 17, 2002. It was the work of decedent for the benefit of defendant-employer that created the necessity for travel on Thursday, May 16, 2002. As such, decedent was in the course of his employment at the time of the accident, even though he was serving at the same time some purpose of his own. Pollock v. Reeves Bros., Inc., 313 N.C. 287, 328 S.E.2d 282 (1985);Humphrey v. Laundry, supra.
6. Decedent's fatal injury by accident arose out of and in the course of his employment with defendant-employer during his travel to Myrtle Beach, South Carolina, on May 16, 2002. N.C. Gen. Stat. § 97-2(6).
7. Susan Bardin Fuller and the minor children, Annie Camp Fuller, Paul Slade Fuller and Landon Alyce Fuller, were wholly dependent upon decedent for support at the time of his death and therefore are entitled to death benefits, share and share alike. N.C. Gen. Stat. § 97-39. Decedent did not leave any other whole dependents.
8. Plaintiffs are entitled to payment of decedent's medical expenses in the amount of $368.50 to Randolph County Emergency Medical Services and $727.20 to Randolph Hospital, for the treatment of the injuries decedent sustained as a result of the injury by accident. N.C. Gen. Stat. § 97-25.
9. Defendants shall pay decedent's funeral expenses up to $3,500.00. N.C. Gen. Stat. § 97-38. Plaintiffs incurred funeral expenses in the amount of $2,534.39.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to attorney's fees approved below, defendants shall pay Susan Bardin Fuller death benefits at the rate of $163.50 per week, beginning May 16, 2002 and continuing for 400 weeks.
2. Subject to attorney's fees approved below, defendants shall pay to decedent's three minor children, Annie Camp Fuller, Paul Slade Fuller and Landon Alyce Fuller, death benefits at the rate of $163.50 per child per week for 400 weeks beginning May 16, 2002, and continuing for each child for 400 weeks or until he or she reaches the age of majority, whichever is greater. Benefits due the minor children shall be paid to Susan Bardin Fuller, their mother and natural guardian, for the use and maintenance of the three minor children.
3. Subject to attorney's fees approved below, all sums that have accrued shall be paid in one lump sum.
4. Defendants shall pay burial expenses in the amount of $2,534.39 to the person or persons entitled.
5. Defendants shall pay for all medical expenses incurred by plaintiffs as a result of decedent's fatal injury by accident, in the amount of $368.50 to Randolph County Emergency Medical Services and $727.20 to Randolph Hospital.
6. A reasonable attorney's fee in the amount of 25% of the compensation awarded plaintiffs is approved for plaintiffs' counsel. The amount that has accrued shall be deducted and paid directly to plaintiff's counsel. Thereafter, plaintiff's counsel shall receive every fourth compensation check due plaintiffs under this Award.
7. Defendants shall pay the costs of this action.
This 12th day of October 2005.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER